# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NAKEITA TATE,** | ) | |
| **14003 Mary Bowie Parkway** | ) | |
| **Upper Marlboro, MD 20774** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:25-cv-3811** |
| | ) | |
| **SCOTT TURNER,** | ) | |
| **In his official capacity** | ) | **Jury Trial Demand** |
| **as HUD Secretary,** | ) | |
| **U.S. Department of Housing** | ) | |
| **and Urban Development,** | ) | |
| **451 7th Street, SW,** | ) | |
| **Washington, DC 20410,** | ) | |
| | ) | |
| *Defendant.* | ) | |
|  | ) | |

## <u>COMPLAINT</u>

Plaintiff Nakeita Tate (hereinafter "Plaintiff" or "Ms. Tate"), by and through undersigned counsel, hereby files this Complaint against Defendant Scott Turner, in his official capacity as Secretary of the United States Department of Housing and Urban Development ("Defendant" or "HUD"). Plaintiff seeks declaratory, injunctive, and equitable relief, compensatory damages, and attorneys' fees for unlawful discrimination on the basis of race (African American), sex (female) and for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and D.C. common law. As a result of Defendant's actions, Plaintiff seeks all available legal and equitable relief, including compensatory damages, back pay, front pay, punitive damages, injunctive relief, and attorneys' fees and costs.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 42 U.S.C. § 2000e-16(c) and 29 U.S.C. § 633a(c), which authorize federal employees to file civil actions in United States District Court after exhaustion of administrative remedies.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(e) because the events giving rise to these acts complained of occurred within the District of Columbia, where Plaintiff was employed by HUD.

## PARTIES

4.      Plaintiff Nakeita Tate is an African American female. She was employed as a Records and Information Management (RIM) Specialist at HUD headquarters in Washington, D.C.

5.      Defendant Scott Turner is the Secretary of the United States Department of Housing and Urban Development. He is being sued in his official capacity. HUD is a federal agency and Plaintiff's employer within the meaning of Title VII.

## FACTUAL BACKGROUND

6.      Ms. Tate was employed as a Records Information Management Specialist, GS-0308-13/2, at HUD headquarters in Washington, D.C. In that role, Ms. Tate was responsible for overseeing the organization's records and information management program as a lead to ensure compliance with relevant laws, regulations, and policies. While serving in position Ms. Tate utilized her experience as a detail-oriented SME Records Manager with a proven track record of developing and implementing comprehensive records management strategies in alignment with organizational objectives and regulatory requirements.

2

7.     She reported to Mr. Thomas Jenkins, the Federal Agency Records Officer, who in turn reported to Acting Director Ms. Nena McDonald and Acting Chief Administrative Officer Mr. Trent Nickels.

8.     After Mr. Jenkins assumed his supervisory role, he created a hostile and intimidating work environment—particularly for the women he supervised. He frequently raised his voice, mocked staff, and emphasized that he "had management's full support" and that employees should "do as they were told." Several employees, including Ms. Tate, raised concerns about his behavior toward Black women. Mr. Jenkins used his male stature and authority to exert power over female employees in lower positions.   When Mr. Jenkins interacted with white women his engagement was more subtle. When dealing with Black women, including Ms. Tate, Angela Morse, Melissa Jones, and Stephanie Stokes, (black women in the Records Information Specialist position) Mr. Jenkins was aggressive, dismissive, and/or hostile in his tone of communication.

9.     On April 11, 2024, at approximately 10:30 a.m., Ms. Tate and her co-worker Ms. Morse were directed to meet with Mr. Jenkins in the basement of HUD Headquarters to begin a records-inventory walkthrough. Contractor Dwayne Inman was also present. Mr. Jenkins informed Ms. Tate and Ms. Morse that they were responsible for completing the inventory of all microfiche boxes within three days. When Ms. Tate and Ms. Morse questioned the feasibility of the deadline and asked whether assistance or tools would be provided, Mr. Jenkins became visibly irritated.

10.     Mr. Jenkins then required Ms. Tate and Ms. Morse to walk through the sub-basement to another room. This room was full of pallets and heavy machinery. Ms. Tate estimated that there were approximately 18-20 pallets and 18,000 cubic measures of records. Ms. Morse

questioned how they would be able to get the work done in three days, and Mr. Jenkins repeated his expectation that the inventory work had to be done in three days. Ms. Morse observed that some boxes were already inventoried and slated for destruction and were missing the HUD-67 form. Mr. Jenkins shouted, "You are to inventory the boxes and use my form! I didn't ask about a HUD-67!"

11.     Ms. Tate attempted to clarify that she was only suggesting a way to expedite the process, but Mr. Jenkins became enraged, ordered Ms. Morse and Mr. Inman to leave, by saying, "Clear the room because I need to get [Ms. Tate] together."

12.     Once alone with Ms. Tate, Mr. Jenkins advanced toward her aggressively, gritting his teeth and shouted in a threatening manner, "I don't know what has gotten into you, but you better get it together right now."

13.     Ms. Tate attempted to deescalate the situation by appeasing Mr. Jenkins and noting that she understood the assignment and was only seeking to find out what tools were available so they could complete the assignment. He slammed his hands on nearby boxes and yelled "you are going to do as you are told." Mr. Jenkins accused Ms. Tate of insubordination and threatened her job.

14.     When Ms. Tate walked towards the door so she could escape, Mr. Jenkins threatened her job again by stating, "You don't know what I can do to you." Ms. Tate then stated that she was uncomfortable in the space, and she was removing herself from the conversation and returning to the walk through with the others. Mr. Jenkins continued to yell at her even as she backed herself out of the room.

15.     Mr. Jenkins followed her into the hallway, again approached her in an aggressive manner and stated, "I don't know where you think you are going!" Mr. Jenkins continued yelling,

and swung his fists in the air while shouting, "I'M ATTACKING YOU? YOU ARE ATTACKING ME!" Ms. Tate was terrified and fled the basement and reported the incident to Mr. Marcus Smallwood, who directed her to Ms. Kim Adams in Administration. Ms. Adams escorted Ms. Tate to the Anti-Harassment Unit to file a formal report.

16.    Ms. Tate's physician placed her on medical leave for stress and anxiety resulting from the incident, from April 11, 2024, through May 6, 2024.

17.    On April 21, 2024, while Ms. Tate was still recovering, Ms. McDonald contacted her about the incident. Ms. McDonald stated that Mr. Jenkins was instructed to have no contact with Ms. Tate. Ms. Tate was temporarily reassigned to Ms. McDonald and informed that Donna Robinson Staton, the Senior Advisor for the Records Division, would assign her work tasks. At the time, the individual responsible for investigating harassment complaints was on leave until May 9, 2024, which delayed the inquiry. No disciplinary or corrective action was taken against Mr. Jenkins.

18.    Ms. Tate feared being alone walking into and around the HUD building, and often times, she relied on colleagues to serve as escorts.

19.    Despite being aware of the physical assault, HUD required Ms. Tate to attend a mandatory training session on May 8, 2024, where Mr. Jenkins was present. HUD's actions forced Ms. Tate to remain in proximity to her assailant, exacerbating her trauma.

20.    On May 15, 2024, Ms. Tate contacted the EEO Counselor, Ms. Winfred Craig, and initiated protected activity under Title VII. She elected to participate in the Alternative Dispute Resolution (ADR) process to resolve her complaint.

21.    On June 13, 2024, Ms. Tate formally requested a transfer out of Mr. Jenkins' division to the Office of Fair Housing and Equal Opportunity (FHEO). Ms. Craig confirmed with

Deputy Chief Administrative Officer, Kevin Cooke, that a position was available. On July 11, 2024, Ms. McDonald informed Ms. Tate that she supported the transfer, and on July 29, 2024, Ms. McDonald confirmed that the transfer had been approved and requested Ms. Tate's résumé for the final package.

22.    After Ms. Tate participated in mediation in late August 2024 to resolve her EEO complaint, Acting Chief Administrative Officer, Trent Nickels, unilaterally paused and refused to release Ms. Tate's transfer, allegedly at the instruction of HUD's Office of General Counsel, "pending the outcome of mediation."

23.    HUD's decision to pause the transfer – after previously approving it – forced Ms. Tate to remain in the same environment as her assailant, undermined the EEO process, and constituted retaliation for her protected activity. Ms. Tate has suffered panic attacks, severe emotional distress, and was diagnosed with situational anxiety. Her treating provider continues to recommend accommodations and ongoing care.

24.    Prior to the physical assault and Ms. Tate's report to the EEO office, she had received successful or super exceeds performance ratings. Ms. Tate went from a highly rated employee who was sought after for her skillset to no longer being the lead on any projects. After the physical aggression by Mr. Jenkins and her complaint, Ms. Tate was rated "fully meets expectations."  Ms. Tate was physically isolated from the team and was removed from major team activities that separated her from projects that she was previously the lead RIM Specialist. Ms. Tate had led the large team project to clean out the subbasement. The project was about 85% complete prior to the physical assault by Mr. Jenkins. Thereafter, Ms. Tate was removed from lead and placed in a lower tier role. Ms. Tate was only provided with limited communication about assignments and denied the team spot awards, while others who had only joined the project

for the latter phase were nominated by Mr. Jenkins for monetary awards from $2,500-$4,000. Ms. Tate was required to work on the sub-basement project in the cleanup and scan development area for more than a year and she was assigned work through a peer. Ms. Tate's peer was granted direction of Ms. Tate's workflow and assignment changes.

25.     Ms. Tate's repeated attempts to seek a safe work environment were ignored and HUD's actions have effectively ended her 25-year professional employment trajectory in records management. HUD later reassigned her to a generic administrative series outside her field, on October 20, 2024, depriving her of advancement opportunities. Ms. Tate was reassigned to the position, Program Analyst, GS-0343-13/2. Ms. Tate has been displaced from her department and the 308 employment series, where she was on track to be promoted to Branch Chief. The 308 employment series has a progression track for promotion. The new position, which is a generic series, has no promotional pathway and the work is unstructured. Ms. Tate has been required to realign her career goals and rebuild a new career.

26.     Ms. Tate has exhausted all administrative remedies. Ms. Tate filed a formal EEO complaint on August 29, 2024 (HUD-00108-2024), alleging that HUD discriminated against her based on race (African-American), sex (female), color (Black), and in reprisal for prior protected activity when: 1. On or around July 29, 2024, the Acting Chief Administrative Officer made a request to pause Complainant's transfer to the Office of Fair Housing and Equal Opportunity, and he refused to release Complainant after participating in the Alternative Dispute Resolution Program and;  2. On or around April 11, 2024, Complainant was assaulted in the workplace (basement of HUD Headquarters building) by her first line supervisor, the Federal Agency Records Officer. The Final Agency Decision was issued on April 1, 2025. On appeal, the EEOC Office of Federal Operations (OFO) issued its final decision affirming the Agency's decision on

July 31, 2025. Ms. Tate was advised of her right to file a civil action "within ninety (90) calendar days from the date that she received the decision. This complaint is timely filed within that period.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e et seq.**
**(Race and Sex Discrimination)**
**Disparate Treatment**

27.     Plaintiff incorporates by reference each of the allegations in the paragraphs above.

28.     At all pertinent times, Defendant was an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

29.     At all pertinent times, Plaintiff was an African American female, fully qualified for her position and entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

30.     Title VII of the Civil Rights Act of 1964 prohibits the federal government, as an employer, from discriminating against employees on the basis of race or sex. 42 U.S.C. § 2000e-16(a). A federal employee may file suit in U.S. district court after exhausting administrative remedies.

31.     Defendant, through its agents, Mr. Jenkins and Mr. Nickels in violation of Title VII, knowingly and intentionally discriminated against Plaintiff on the basis of her race (Black) and sex (female) by tolerating and failing to remedy the aggressive and threatening conduct of Mr. Jenkins, who physically and verbally assaulted Plaintiff in the workplace on April 11, 2024.

32.     Plaintiff's protected characteristics were motivating factors in Mr. Jenkins's treatment of her, as he displayed aggression toward Black female employees while treating White employees with more respect and restraint. Upon information and belief, Mr. Jenkins did not subject similarly situated White employees or males to the same level of hostility or public

humiliation. White and/or male employees were not yelled at, threatened, or accused of insubordination. Mr. Jenkins did not raise his voice or mock staff who were White and/or males.

33.     Defendant further discriminated against Plaintiff by refusing to remove or discipline Mr. Jenkins after her report, forcing her to continue working near him, and denying her a safe and fair working environment.

34.     Defendant's actions were motivated by discriminatory animus towards Plaintiff's race and sex and constituted unlawful disparate treatment in violation of Title VII.

35.     As a direct and proximate cause of Defendant's actions, Plaintiff suffered severe emotional distress, humiliation, anxiety, reputational harm, and loss of career advancement.

36.     Defendant had no legitimate business reason for any such acts.

37.     Plaintiff is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendant may have engaged in other discriminatory acts toward Plaintiff that are not yet fully known.

**COUNT II**
**Violation of Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e et seq.**
**(Race and Sex Discrimination)**
**Hostile Work Environment**

38.     Plaintiff adopts by reference each of the allegations in the paragraphs above.

39.     Title VII prohibits employers from subjecting employees to a hostile work environment based on a protected characteristic such as race or sex.

40.     Defendant created and perpetuated a hostile work environment by allowing Mr. Jenkins's assaultive conduct, shouting, and intimidation to continue without discipline, delaying the investigation, and requiring her to attend a mandatory meeting with her assailant on May 8, 2024. Plaintiff feared for her safety at the workplace and requested to have escorts walk with her in and out of the building.

9

41.     Further, Defendant impeded Plaintiff's ability to transfer out of Mr. Jenkins' department.

42.     The conduct Plaintiff was subjected was severe and pervasive, altering the conditions of Plaintiff's employment and creating an intimidating and humiliating workplace that interfered with her ability to perform her duties and feel safe at work.

43.     The conduct was based on Plaintiff's race and sex, as Mr. Jenkins targeted and demeaned Black women and used his authority as a male supervisor to intimidate them.

44.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress, loss of professional reputation, and diminished career opportunities.

45.     Defendant had no legitimate business reason for permitting or condoning such conduct.

46.     Plaintiff is informed and believes, and based thereon alleges, that Defendant may have engaged in additional discriminatory or harassing practices that are not yet fully known.

**COUNT III**
**Violation of Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e et seq.**
**(Retaliation)**

47.     Plaintiff adopts by reference each of the allegations in the paragraphs above.

48.     Title VII prohibits employers from retaliating against employees who oppose discriminatory practices, file internal complaints, or participate in protected EEO activity.

49.     Defendant, in violation of Title VII, knowingly and intentionally retaliated against Plaintiff for engaging in protected EEO activity, including her April 11, 2024, assault report, May 15, 2024, EEO counseling, June 2024 transfer request, and August 29, 2024 formal EEO complaint.

50.     Both Mr. Jenkins and Mr. Nickel were aware of Plaintiff's protected activity.

51.    Defendant subjected Plaintiff to retaliatory conduct by physically isolating her from the team and removing her from major team activities that separated her from projects that she was previously the lead RIM Specialist on. Plaintiff was only provided with limited communication about assignments and denied the team spot awards. Ms. Tate was removed from lead on the sub-basement project and assigned a lower tier role. Although she had led the majority of the work on the project, Mr. Jenkins did not nominate her for a monetary spot award. Ms. Tate's peer was granted direction of Ms. Tate's workflow and assignment changes.

52.    Defendant further retaliated against Ms. Tate by rating her as "fully meets expectations" which was a lower rating than she had received in prior years; by blocking her approved transfer to the Office of Fair Housing and Equal Opportunity, delaying the investigation of her assault, and compelling her to interact with her assailant. Plaintiff suffered adverse actions in close proximity to her protected activity that were intended to punish her for pursuing prior EEO claims against Mr. Jenkins.

53.    Defendant's retaliatory conduct would dissuade a reasonable employee from engaging in protected activity. These retaliatory actions violated Title VII of the Civil Rights Act of 1964.

54.    As a direct and proximate cause of Defendant's retaliation, Plaintiff suffered emotional distress, humiliation, anxiety, and loss of professional standing.

55.    Defendant had no legitimate business reason for any such acts.

56.    Plaintiff is informed and believes, and based thereon alleges, that Defendant may have engaged in additional retaliatory acts that are not yet fully known.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant the following relief:

A.    Declare that Defendant's actions violated Title VII of the Civil Rights Act of 1964 and the common law of the District of Columbia;

B.    Order Defendant to take immediate corrective and preventive actions to ensure a workplace free of discrimination, retaliation, and negligence in supervision;

C.    Order Defendant to reinstate Plaintiff to her professional classification as a Records and Information Management Specialist (GS-13) or, in the alternative, award front pay for lost career advancement opportunities;

D.    Award Plaintiff compensatory damages in an amount not less than Five Million Dollars ($5,000,000) for emotional distress, humiliation, and loss of professional reputation;

E.    Award Plaintiff damages for physical and psychological injury, and for pain and suffering proximately caused by Defendant's negligent supervision and failure to protect;

F.    Restore all annual and sick leave used as a result of the assault, retaliation, and ensuing medical treatment;

G.    Award punitive damages to deter Defendant and other employers from similar willful or reckless disregard of employee safety and civil rights;

H.    Award Plaintiff reasonable attorney's fees, expert fees, and costs incurred in pursuing this action pursuant to 42 U.S.C. § 2000e-5(k); and

I.    Grant such other and further relief as the Court deems just and proper.

**<u>JURY TRIAL DEMAND</u>**

Plaintiff demands a jury trial on all issues so triable against Defendant.

Date: October 29, 2025

Respectfully submitted,

/s/ *David A. Branch*
David A. Branch, D.C. Bar No. 438764
Law Office of David A. Branch &
Associates, PLLC
1120 Connecticut Avenue, NW, Suite 500
Washington, D.C. 20036
Phone: (202) 785-2805
Fax: (202) 785-0289
Email: davidbranch@dbranchlaw.com